UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

OBA STEPHENS,

                            Plaintiffs,

          -against-

CITY OF NEW YORK; NEW YORK CITY MAYORS
BILL DE BLASIO; MICHAEL BLOOMBERG;
ELECTED OFFICIALS JOHN DOE 1 through 20 and
JANE DOE 21 through 40, individually and in their official
capacities, NEW YORK CITY POLICE
COMMISSIONERS RAYMOND KELLY, WILLIAM
BRATTON, POLICE OFFICERS JAMES DOE 1 through
20,000 AND JUNE DOE 20,001 through 50,0000,
individually and in their official capacities, NEW YORK
CITY DEPARTMENT OF TRANSPORTATION
COMMISSIONERS IRIS WEINSHALL, JANETTE
SADIK-KHAN, POLLY TROTTENBERG, NEW YORK
CITY DEPARTMENT OF FINANCE COMMISSIONERS
MARTHA STARK, MICHAEL HYMAN, DAVID
FRANKEL, BETH GOLDMAN, JACQUES JIHA, and
NEW YORK CITY DEPARTMENT OF SANITATION
COMMISSIONER KATHRYN GARCIA,

                            Defendants.

-----------------------------------------------------------------x

CV 15-0567

**COMPLAINT**

Jury Trial Demanded



RECEIVED
FEB - 5 2015
PRO SE OFFICE

KUNTZ, J.

GO, M.J.

## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of plaintiff's

rights under the United States Constitution and New York State Constitution and relevant case law,

to recover property confiscated from plaintiff in violation of plaintiff's rights under the United

States and New York State Constitution, nominal and general damages, to recover prejudgment

interest for the property unconstitutionally seized by defendants, to recover punitive damages,

attorneys fees, and whistleblower damages award and for declaratory judgment that the policy of the

defendants is unconstitutional.

2.      Defendants established a pseudo Palestinian state where Jewish Americans are exempted from the enforcement of various laws while the City of New York and the defendants enforce additional laws, stricter laws, punitive fines, tow fees, late fees, storage fees and the threat of seizure of vehicles on African Americans, Hispanic Americans, Asian Americans, Indian Americans, non-Jewish Caucasian Americans, Christians, Muslims, Sikhs than are imposed on Jewish Americans. This is done through the actions of the City.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

4.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

6.      This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

7.      Within ninety days after the claims in this complaint arose, plaintiff served a written notice of claim on the defendants at the New York City Law Department and the New York City Comptroller's Office at 100 Church Street, New York New York. See Exhibit A.

8.      After Plaintiff served a notice of claim to the City of New York propounded written discovery demand on the Plaintiff and Plaintiff provided a Response thereto.

9.      The City also served a demand for a 50-h hearing on Plaintiff. Plaintiff appeared for and testified at a 50h hearing conducted by a duly authorized law firm on behalf of the City of New York.

10.     At least 90 days have elapsed since the service of the notice of claim and defendant City of New York has not offed an adjustment or payment of the claims.

11.     At least 60 days have elapsed since the service of the notice of claim and plaintiff appeared at and testified at the 50-h hearing and defendant City of New York has not offered an adjustment or payment of the claims.

12.     The City of New York has not offered to settle plaintiff's claims.

13.     The City of New York and the defendants continue their policy and practice of the unconstitutional enforcement of traffic rules.

14.     Plaintiff suffered damage as a result of defendants' actions.  The defendants took plaintiff's money on multiple occasions and threatened the seizure of plaintiff's automobile.  Plaintiff was deprived of his liberty, suffered emotional distress, mental anguish, fear, pain, anxiety, embarrassment, humiliation, and damage to their reputations. The actions of the City of New York and defendants negatively impacted plaintiff's ability to engage in commerce, obtain housing and has diluted his vote.

## JURY DEMAND

15.     Plaintiff demands a trial by jury in this action.

## PARTIES

16.     Plaintiff Oba Stephens ("Mr. Stephens") is an African-American male.  At the time of the events described herein, plaintiff resided in Kings County in the City and State of New York.

17.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

18.    The City of New York consists of five boroughs, Kings County, Queens County, Richmond County, New York County and Bronx County.

19.    The City of New York has a Mayor.

20.    The City of New York has a Police Department.

21.    The City of New York has a Department of Transportation.

22.    The City of New York has a Department of Finance.

23.    The City of New York has a Department of Sanitation.

24.    Defendant Bill DeBlasio is the Mayor of the City of New York.

25.    Defendant Bill DeBlasio was the Mayor of the City of New York in 2014.

26.    Defendant Mayor Michael Bloomberg is the former Mayor of the City of New York.

27.    Mayor Michael Bloomberg was the Mayor of the City of New York in 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013.

28.    Defendant William Bratton is the Commissioner of the New York City Police Department.

29.    Defendant William Bratton was the Commissioner of the New York City Police Department in 2014.

30.    Defendant Raymond Kelly was the Commissioner of the New York City Police Department.

31.    Defendant Raymond Kelly was the Commissioner of the New York City Police Department in 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013.

32.     Defendant Iris Weinshall was the Commissioner of the New York City Department of Transportation Commissioner.

33.     Defendant Iris Weinshall was the Commissioner of the New York City Department of Transportation in 2002, 2003, 2004, 2005, 2006, and 2007.

34.     Defendant JANETTE SADIK-KHAN was the Commissioner of the New York City Department of Transportation Commissioner.

35.     Defendant JANETTE SADIK-KHAN was the Commissioner of the New York City Department of Transportation in 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

36.     Defendant Molly Trottenberg is the Commissioner of the New York City Department of Transportation.

37.     Defendant Molly Trottenberg was the Commissioner of the New York City Department of Transportation in 2013 and 2014.

38.     Defendant MARTHA STARK was the Commissioner of the New York City Department of Finance.

39.     Defendant MARTHA STARK was the Commissioner of the New York City Department of Finance in 2002, 2003, 2004, 2005, 2006, 2007, 2008 and 2009.

40.     Defendant MICHAEL HYMAN was the Commissioner of the New York City Department of Finance.

41.     Defendant MICHAEL HYMAN was the Commissioner of the New York City Department of Finance in 2009.

42.     Defendant **DAVID FRANKEL** was the Commissioner of the New York City Department of Finance.

43.     Defendant **DAVID FRANKEL** was the New York City Department of Finance in 2009, 2010, 2011, 2012 and 2013.

44.     Defendant **BETH GOLDMAN** was the Commissioner of the New York City Department of Finance.

45.     Defendant **BETH GOLDMAN** was the New York City Department of Finance in 2013, and 2014.

46.     Defendant Jacques Jiha is the Commissioner of the New York City Department of Finance.

47.     Defendant Jacques Jiha was the Commissioner of the New York City Department of Finance in 2014.

48.     Defendant Katheryn Garcia is the Commissioner of the New York City Department of Sanitation.

49.     Defendant Elected Officials John Doe 1 through 20 and Jane Doe 21 through 40 at all times relevant herein, were elected officials, employees and agents of the defendant City of New York.  Upon information and belief, at all relevant times herein, John Doe 1 through 20 and Jane Doe 21 through 40 worked within the City of New York.  Plaintiff does not know the real name of John Doe 1 through 20 and Jane Doe 21 are sued in their individual and official capacities.

50.     Defendant Police Officer James Doe 1 through 20,000 and June Doe 20,001 through 50,000 ("Doe 2"), at all times relevant herein, were an police officers, traffic agents, school safety agents, employees and agents of the NYPD.  Upon information and belief, at all relevant times

herein, they were assigned throughout the City.  Plaintiff does not know the real name of James Doe 1 through 20,000 and June Doe 20,001 through 50,000 sued in their individual and official capacities.

## STATEMENT OF FACTS

51.     The defendant City of New York employs thousands of uniformed and non-uniformed police officers, traffic agents, school safety agents, sanitation workers and parks employees to issue parking summonses throughout the City of New York.

52.     The defendant City of New York's John or Jane Doe agent (hereinafter agent) issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday August 24, 2013 at approximately 8:41 a.m. in the vicinity of 261 Kingston Avenue, Brooklyn New York.

53.     The defendant City of New York's agent issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday August 24, 2013 at approximately 8:41 a.m. in the vicinity of 261 Kingston Avenue, Brooklyn New York on Kingston Avenue between Eastern Parkway and St. Johns Avenue, Brooklyn, New York.

54.     The defendant City of New York's agent issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday August 24, 2013 at approximately 8:41 a.m. in the vicinity of 261 Kingston Avenue, Brooklyn New York while Plaintiff was shopping.

55.     The defendant City of New York's street cleaning parking ticket that was issued to Plaintiff's vehicle on August 24, 2013 was numbered #7541132019.

56.     This summons numbered #7541132019 was issued in Brooklyn, on Kingston Avenue in a predominantly African American neighborhood.

57.     Defendant City of New York sent Plaintiff late notices through the United States Postal Service mail in an effort to collect the parking fine for summons #7541132019.

58.     Defendant City of New York threatened to physically seize plaintiff's vehicle.

59.     Plaintiff paid the defendant City of New York for the parking ticket #7541132019.

60.     Plaintiff's vehicle's license plate is FRA2943.

61.     The defendant City of New York issued Plaintiff's vehicle a parking ticket for a parking meter violation on Saturday September 21, 2013 at approximately 1:38 p.m. in the vicinity of 256 Kingston Avenue, Brooklyn New York.

62.     The defendant City of New York's agent issued Plaintiff's vehicle a parking ticket for an expired meter parking ticket on September 21, 2013 and that parking ticket was numbered #7544247892.

63.     Defendant City of New York sent Plaintiff late notices through the United States Postal Service mail in an effort to collect the parking fine for summons #7544247892.

64.     This summons numbered #7544247892 was issued in Brooklyn, on Kingston Avenue in a predominantly African American neighborhood

65.     Defendant City of New York threatened to physically seize plaintiff's vehicle.

66.     Plaintiff paid the defendant City of New York for the parking ticket #7544247892.

67.     Plaintiff's vehicle's license plate is FRA2943.

68.     The defendant City of New York issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday May 24, 2014 at approximately 7:46 a.m. in the vicinity of 252 Kingston Avenue, Brooklyn New York.

69.   The defendant City of New York issued Plaintiff's vehicle was issued a parking ticket for a street cleaning violation on Saturday May 24, 2014 at approximately 7:46 a.m. in the vicinity of 252 Kingston Avenue, Brooklyn New York which is between Eastern Parkway and St. Johns Avenue, Brooklyn New York.

70.   The defendant City of New York issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday May 24, 2014 at approximately 7:46 a.m. in the vicinity of 252 Kingston Avenue, Brooklyn New York while Plaintiff was shopping.

71.   The defendant City of New York's street cleaning parking ticket that was issued to Plaintiff's vehicle on May 24, 2014 was numbered #7808548212.

72.   This summons numbered #7808548212 was issued in Brooklyn, on Kingston Avenue in a predominantly African American neighborhood

73.   Plaintiff paid the defendant City of New York for the parking ticket #7808548212.

74.   The defendant City of New York issued Plaintiff's vehicle a parking ticket for a parking meter violation on Saturday May 24, 2014 at approximately 9:12 a.m. in the vicinity of 250 Kingston Avenue, Brooklyn New York.

75.   The defendant City of New York issued Plaintiff's vehicle was issued a parking ticket for a street cleaning violation on Saturday May 24, 2014 at approximately 9:12 a.m. in the vicinity of 250 Kingston Avenue, Brooklyn New York between Eastern Parkway and St. Johns Avenue, Brooklyn New York.

76.   The defendant City of New York issued Plaintiff's vehicle a parking ticket for a street cleaning violation on Saturday May 24, 2014 at approximately 9:12 a.m. in the vicinity of 250 Kingston Avenue, Brooklyn New York while Plaintiff was shopping.

77.   The defendant City of New York's issued Plaintiff's vehicle a parking ticket for an expired meter parking ticket on May 24, 2014 at approximately 9:12 a.m. in the vicinity of 250 Kingston Avenue, Brooklyn New York and that parking ticket was numbered #8003550373.

78.   This summons numbered #8003550373 was issued in Brooklyn, on Kingston Avenue in a predominantly African American neighborhood

79.   Plaintiff paid the defendant City of New York for the parking ticket #8003550373.

80.   On Kingston Avenue on the other side of Eastern Parkway in a Jewish neighborhood those 4 tickets would never have been issued because the City of New York and the defendants has a policy of exempting Jewish Americans from parking rules on Saturdays.

81.   The Plaintiff paid for a meter on Saturday October 2, 2013 at machine 3393004 at approximately 1:29 p.m..

82.   In Saturdays on 2011 Plaintiff voluntarily paid over one hundred and fifty dollars for parking meters.

83.   In Saturdays on 2012 Plaintiff voluntarily paid over one hundred and fifty dollars for parking meters.

84.   In Saturdays on 2013 Plaintiff voluntarily paid over one hundred and fifty dollars for parking meters.

85.   In Saturdays on 2014 Plaintiff voluntarily paid over one hundred and fifty dollars for parking meters in 2014.

86.   In Jewish neighborhoods Plaintiff never would have had to pay parking meters on Saturdays because the because the City of New York and the defendants has a policy of exempting Jewish Americans from paying parking meters on Saturdays.

10

87. Mayor Bill de Blasio formulated the City of New York's discriminatory parking policy.

88. Mayor Michael Bloomberg formulated the City of New York's discriminatory parking policy.

89. Police Commissioner Raymond Kelly formulated the City of New York's discriminatory parking policy.

90. Police Commissioner William Bratton formulated the City of New York's discriminatory parking policy.

91. Defendant City of New York's Police Department received funding from the federal government in 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

92. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 and 2013 Defendant Mayor Bloomberg and the New York City Police Department Commissioner Raymond Kelly discussed City's parking policy.

93. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 and 2013 Defendant Mayor Bloomberg and the New York City Police Department Commissioner Raymond Kelly formulated the City's parking policy.

94. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 and 2013 Defendant Mayor Bloomberg and the New York City Police Department Raymond Kelly implemented the City's parking policy.

95. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 and 2013 Defendant Mayor Bloomberg and the New York City Police Department Raymond Kelly enforced the City's parking policy.

96.     In 2014 Defendant Mayor de Blasio and the New York City Police Department Commissioner William Bratton discussed City's parking policy.

97.     In 2014 Defendant Mayor de Blasio and the New York City Police Department Commissioner William Bratton formulated the City's parking policy.

98.     In 2014 Defendant Mayor de Blasio and the New York City Police Department defendant William Bratton implemented the City's parking policy.

99.     In 2014 Defendant Mayor de Blasio and the New York City Police Department defendant William Bratton enforced the City's parking policy.

100.     The Commissioner of the New York City Police Department supervises police officers, traffic agents, school safety agents, civilian employees of the New York City Police Department.

101.     Defendant City of New York operates a New York City Police Department a department or agency that employ's Police Officers, Traffic Agents, and School Safety Officers that are authorized to issue parking tickets to vehicles in New York City.

102.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York operated a New York City Police Department a department or agency that employed Police Officers that were authorized to issue parking tickets to vehicles in New York City.

103.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York's New York City Police Department a department or agency Police Officers issued parking tickets to vehicles in New York City.

104.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York operated a New York City Police Department a department or agency that employed Traffic Enforcement Officers that were authorized to issue parking tickets to vehicles in New York City.

105.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York's New York City Police Department a department or agency Traffic Enforcement Officers issued parking tickets to vehicles in New York City.

106.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York's New York City Police Department a department or agency Traffic Enforcement Officers towed vehicles for parking violations in New York City.

107.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 Defendant City of New York's New York City Police Department a department or agency School Safety Agents issued parking tickets to vehicles in New York City

108.    Defendant City of New York operates an agency or department called Department of Transportation.

109.    The New York City Department of Transportation Commissioner serves at the will of the Mayor of the City of New York.

110.    The Mayor of the City of New York can remove the Commissioner of the New York City Department of Transportation.

111.    The Mayor of the City of New York can discharge the Commissioner of the New York City Department of Transportation.

112.    Defendant City of New York's Department of Transportation receives funding from the federal government.

113.    Defendant City of New York's Department of Transportation has received funding from the federal government in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

114.    Defendant City of New York Department of Transportation regulates transportation for roadways within the City of New York.

115.    Defendant City of New York Department of Transportation controls transportation for roadways within the City of New York.

116.    Defendant City of New York Department of Transportation implements transportation rules for the City.

117.    Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York responsible for the design of roadway signs on roadways in the City of New York.

118.    Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York responsible for the contents of roadway signs on roadways in the City of New York.

119.    Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York responsible for the placement of roadway signs on roadways in the City of New York.

120.     Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York responsible for the installation of roadway and parking signs in the City of New York.

121.     Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York responsible for the maintenance of the roadway and parking signs in the City of New York.

122.     Defendant City of New York operated a Department of Transportation that was headed by a Commissioner in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 and 2015.

123.     Department of Transportation Commissioner Iris Weinshall formulated the City's parking policy.

124.     Department of Transportation Commissioner Janette Sadik-Khan formulated the City's parking policy.

125.     Department of Transportation Commissioner Polly Trottenberg formulated the City's parking policy.

126.     In 2002, 2003, 2004, 2005, 2006, and 2007 Mayor Bloomberg and New York City Department of Transportation Commissioner Iris Weinshall discussed New York City Department of Transportation policy.

127.     In 2002, 2003, 2004, 2005, 2006, and 2007 Mayor Bloomberg and New York City Department of Transportation Commissioner Iris Weinshall formulated New York City Department of Transportation policy.

128.    In 2002, 2003, 2004, 2005, 2006, and 2007 Mayor Bloomberg and New York City Department of Transportation Commissioner Iris Weinshall implemented New York City Department of Transportation policy.

129.    In 2002, 2003, 2004, 2005, 2006, and 2007 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Iris Weinshall and discussed City's parking policy.

130.    In 2002, 2003, 2004, 2005, 2006, and 2007 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Iris Weinshall formulated City' parking policy.

131.    In 2002, 2003, 2004, 2005, 2006, and 2007 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Iris Weinshall implemented City's parking policy.

132.    In 2002, 2003, 2004, 2005, 2006, and 2007 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Iris Weinshall enforced City's parking policy

133.    The City of New York's Department of Transportation Commissioner was Commissioner Janette Sadik-Khan.

134.    The City of New York's Department of Transportation Commissioner in 2007, 2008, 2009, 2010, 2011, 2012, and 2013 was Commissioner Janette Sadik-Khan

135.    In 2007, 2008, 2009, 2010, 2011, 2012, and 2013 Mayor Bloomberg and City of New York's Department of Transportation Commissioner Janette Sadik-Khan discussed City of New York Department of Transportation policy.

16

136.    In 2007, 2008, 2009, 2011, 2012, and 2013 Mayor Bloomberg and City of New York's Department of Transportation Commissioner Janette Sadik-Khan formulated City of New York Department of Transportation policy.

137.    In 2007, 2008, 2009, 2011, 2012, and 2013 Mayor Bloomberg and City of New York's Department of Transportation Commissioner Janette Sadik-Khan implemented City of New York Department of Transportation policy.

138.    In 2007, 2008, 2009, 2010, 2011, 2012, and 2013 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Janette Sadik-Khan discussed City's parking policy.

139.    In 2007, 2008, 2009, 2010, 2011, 2012, and 2013 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Janette Sadik-Khan formulated New York City' parking policy.

140.    In 2007, 2008, 2009, 2010, 2011, 2012, and 2013 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Janette Sadik-Khan implemented New York City's parking policy.

141.    In 2007, 2008, 2009, 2010, 2011, 2012, and 2013 Defendant Mayor Bloomberg, New York City Police Department Commissioner defendant Raymond Kelly and New York City Department of Transportation Commissioner defendant Janette Sadik-Khan enforced New York City's parking policy.

142.    In 2014 the New York City Department of Transportation Commissioner was Polly Trottenberg.

143.    In 2014 Mayor Bill de Blasio and New York City Department of Transportation Commissioner Polly Trottenberg discussed City of New York Department of Transportation policy.

144.    In 2014 Mayor Bill de Blasio and New York City Department of Transportation Commissioner Polly Trottenberg formulated City of New York Department of Transportation policy.

145.    In 2014 Mayor Bill de Blasio and New York City Department of Transportation Commissioner Polly Trottenberg implemented City of New York Department of Transportation policy

146.    The Commissioner of Department of Transportation supervises the employees of the Department of Transportation.

147.    Defendant City of New York streets and roadways are open for travel for vehicles that are registered in New York State.

148.    Defendant City of New York streets and roadways are open for travel for vehicles that are registered from any of the other 49 States of the United States of America.

149.    Defendant City of New York streets and roadways are open for travel for vehicles that are registered from other countries.

150.    Vehicular travel on Defendant City roadways is for recreational purposes.

151.    Vehicular travel on Defendant City roadways is for commercial activity.

152.    Defendant City of New York operates a New York City Department of Transportation a department or agency of defendant City of New York that posts parking signs can regulate parking of vehicles.

153.    Defendant City of New York operates a New York City Department of Transportation a department or agency of defendant City of New York that posts New York City Department of Transportation parking signs can regulate standing of vehicles.

154.    Defendant City of New York operates a New York City Department of Transportation a department or agency of defendant City of New York that posts New York City Department of Transportation parking signs can regulate stopping of vehicles.

155.    Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York that posts parking signs that identify Street Cleaning Regulations.

156.    Defendant City of New York operates a Department of Transportation a department or agency of defendant City of New York that posts parking signs that identify Parking Meter Regulations.

157.    The City also has traffic regulations to regulate parking near fire hydrants.

158.    Defendant City of New York can issue a parking ticket to a vehicle that is parked contrary to the posted parking regulation.

159.    Defendant City of New York and its agents can issue a parking ticket to a vehicle that is parked contrary to the posted parking regulation.

160.    Defendant City of New York and its agents can issue a parking ticket to a vehicle that is parked contrary to the traffic rules.

161.    Defendant City of New York through it's agents can issue a parking ticket to a vehicle that is parked contrary to the posted parking regulation

162.    Defendant City of New York through it's agents can tow a vehicle that is parked contrary to the posted parking regulation.

163.    Defendant City of New York reserves the right to tow a vehicle that is parked contrary to the posted parking regulation.

164.    In 2014 Defendants Mayor DeBlasio, Police Commissioner Bratton, and Commissioner Polly Trottenberg discussed City's parking policy.

165.    In 2014 Defendants Mayor de Blasio, Police Commissioner Bratton and Commissioner Polly Trottenberg formulated City' parking policy.

166.    In 2014 Defendant Mayor de Blasio, Police Commissioner William Bratton and Commissioner Polly Trottenberg implemented City's parking policy.

167.    Defendant City of New York operates a department or agency called the Department of Finance that is supervised by a Commissioner.

168.    The New York City Department of Transportation Commissioner serves at the will of the Mayor of the City of New York.

169.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009 the New York City Department of Finance Commissioner was defendant Commissioner Martha Stark.

170.    The New York City Department of Finance Commissioner in 2009 was defendant Commissioner Michael Hyman.

171.    The New York City Department of Finance Commission in 2009, 2010, 2011, 2012, and 2013 was David Frankel.

172.     The New York City Department of Finance Commissioner in 2013 was Commissioner Beth Goldman.

173.     The New York City Department of Finance Commissioner in 2014 was   Jacques Jiha.

174.     In 2003, 2004, 2005, 2006, 2008, and 2009 Defendants Mayor Bloomberg discussed Defendant City's parking ticket revenue strategies with defendant Commissioner Martha Stark.

175.     In 2003, 2004, 2005, 2006, 2008, and 2009 Defendant Mayor Bloomberg developed defendant City's parking ticket revenue strategies with defendant Commissioner Martha Stark.

176.     In 2003, 2004, 2005, 2006, 2008, and 2009 Defendant Mayor Bloomberg Defendant designed City's parking ticket revenue strategies with defendant Commissioner Martha Stark.

177.     In 2003, 2004, 2005, 2006, 2008, and 2009 Defendants Mayor Bloomberg, City of New York, and Commissioner Martha Stark implemented the City's parking ticket revenue strategies.

178.     In 2003, 2004, 2005, 2006, 2008, and 2009 Defendants Mayor Bloomberg, City of New York, and Commissioner Martha Stark enforced the City's parking ticket revenue strategies.

179.     In 2003, 2004, 2005, 2006, and 2007 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Iris Weinshall and Commissioner Martha Stark discussed Defendant City's parking ticket revenue strategies.

180.     In 2003, 2004, 2005, 2006, and 2007 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Iris Weinshall and Commissioner Martha Stark developed Defendant City's parking ticket revenue strategies.

181.   In 2003, 2004, 2005, 2006, and 2007 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Iris Weinshall and Commissioner Martha Stark implemented Defendant City's parking ticket revenue strategies.

182.   In 2003, 2004, 2005, 2006, and 2007 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Iris Weinshall and Commissioner Martha Stark enforced Defendant City's parking ticket revenue strategies.

183.   In 2007, 2008, 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Martha Stark discussed Defendant City's parking ticket revenue strategies.

184.   In 2007, 2008, 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Martha Stark developed Defendant City's parking ticket revenue strategies.

185.   In 2007, 2008, 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Martha Stark implemented Defendant City's parking ticket revenue strategies.

186.   In 2007, 2008, 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Martha Stark enforced Defendant City's parking ticket revenue strategies.

187.   In 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Michael Hyman discussed Defendant City's parking ticket revenue strategies.

188.    In 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Michael Hyman developed Defendant City's parking ticket revenue strategies.

189.    In 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Michael Hyman implemented Defendant City's parking ticket revenue strategies.

190.    In 2009 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan and Commissioner Michael Hyman enforced Defendant City's parking ticket revenue strategies.

191.    In 2009, 2010, 2011, 2012, and 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan, Commissioner David Frankel discussed Defendant City's parking ticket revenue strategies.

192.    In 2009, 2010, 2011, 2012, and 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan, Commissioner David Frankel developed Defendant City's parking ticket revenue strategies.

193.    In 2009, 2010, 2011, 2012, and 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan, Commissioner David Frankel implemented Defendant City's parking ticket revenue strategies.

194.    In 2009, 2010, 2011, 2012, and 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner Janette Sadik-Khan, Commissioner David Frankel enforced Defendant City's parking ticket revenue strategies.

195.    In 2013 Defendant Mayor Bloomberg developed defendant City's parking ticket revenue strategies with Department of Finance Commissioner Beth Goldberg.

196.    In 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner defendant Janette Sadik-Khan and Commissioner Beth Goldberg discussed Defendant City of New York's parking ticket revenue strategies.

197.    In 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner defendant Janette Sadik-Khan and Commissioner Beth Goldberg developed Defendant City of New York's parking ticket revenue strategies.

198.    In 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner defendant Janette Sadik-Khan and Commissioner Beth Goldberg implemented Defendant City of New York's parking ticket revenue strategies

199.    In 2013 Defendants Mayor Bloomberg, Police Commissioner Raymond Kelly, Commissioner defendant Janette Sadik-Khan and Commissioner Beth Goldberg enforced Defendant City of New York's parking ticket revenue strategies

200.    Defendant City of New York Department of Finance collects revenue for defendant City.

201.    Defendant City of New York Department of Finance spends collected parking ticket revenue to pay City expenses.

202.    Defendant City of New York Department of Finance collects revenue from ticket fines issued to illegally parked vehicles.

203.    Defendant City of New York Department of Finance collects revenue from tow fines issued to illegally parked vehicles that were towed.

204.    In 2014 Defendant Mayor de Blasio discussed Defendant City's parking ticket revenue strategies with Department of Finance Commissioner Molly Trottenberg.

205.    In 2014 Defendant Mayor de Blasio developed defendant City's parking ticket revenue strategies with Department of Finance Commissioner Molly Trottenberg.

206.    In 2014 Defendant Mayor de Blasio Defendant designed City's parking ticket revenue strategies with Department of Finance Commissioner Molly Trottenberg.

207.    In 2014 Defendant Mayor de Blasio Defendant implemented City's Department parking ticket revenue strategies with Department of Finance Commissioner Molly Trottenberg.

208.    In 2014 Defendants Mayor de Blasio, and Commissioner William Bratton, Commissioner Molly Trottenberg and Commissioner Jiha discussed Defendant City's parking ticket revenue strategies.

209.    In 2014 Defendants Mayor de Blasio, and Commissioner William Bratton, Commissioner Molly Trottenberg and Commissioner Jiha developed Defendant City's parking ticket revenue strategies.

210.    In 2014 Defendants Mayor de Blasio, and Commissioner William Bratton, Commissioner Molly Trottenberg and Commissioner Jiha implemented Defendant City's parking ticket revenue strategies.

211.    In 2014 Defendants Mayor de Blasio, and Commissioner William Bratton, Commissioner Molly Trottenberg and Commissioner Jiha enforced Defendant City's parking ticket revenue strategies.

212.    In 2014 Defendants Mayor de Blasio, and Commissioner William Bratton, Commissioner Molly Trottenberg and Commissioner Goldman enforced Defendant City's parking ticket revenue strategies.

213.    The commissioner of the department of Sanitation engaged in discussions and policy formation that created and or perpetuated the discriminatory parking rules in favor of Jewish Americans over the rights of African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikhs Americans, agnostics and atheists.

214.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2003.

215.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2004.

216.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2005.

217.    The City of New York and its agents issued over 100.000 parking tickets to motorists for expired meters on Saturdays in 2006.

218.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2007.

219.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2008.

220.    The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2009.

221.     The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2010.

222.     The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2011.

223.     The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2012.

224.     The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2013.

225.     The City of New York and its agents issued over 100,000 parking tickets to motorists for expired meters on Saturdays in 2014.

226.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2003.

227.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2004.

228.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2005.

229.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2005.

230.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2006.

231.     The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2007.

232.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2008.

233.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2009.

234.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2010.

235.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2011.

236.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2012.

237.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2013.

238.    The City of New York and its agents issued over 90,000 parking tickets to motorists for street cleaning regulations on Saturdays in 2014.

239.    The City of New York imposes a fine of at least twenty-five (25) dollars per parking ticket issued for street cleaning regulations in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

240.    The City of New York imposes a fine of at least twenty-five (25) dollars per parking ticket issued for expired meter regulations in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

241.     The City of New York imposes late fees of up to sixty (60) dollars per parking ticket issued for any violation of any parking rule in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

242.     The City of New York parking meters generated millions of dollars of revenue paid voluntarily by motorists at parking meters and municipal meters in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2013, 2014.

243.     The City of New York issued thousands of parking tickets for hydrant violations from Friday evening to Monday morning in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

244.     The City of New York imposes a fine of at least fifty-five (55) dollars per parking ticket issued for hydrant violations in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

245.     The City of New York towed thousands to motor vehicles from Friday evening to Monday morning for being parked illegally in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

246.     In 2003 the City of New York had a pattern and practice of not installing hour specific parking regulations that applied from Friday evening to Sunday morning in Jewish neighborhoods.

247.     In 2003 the City of New York had a pattern and practice of not enforcing hour specific parking regulations that applied from Friday evening to Sunday morning in Jewish neighborhoods.

248.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York had a pattern and practice of not issuing parking tickets for hour specific parking regulations that applied from Friday evening to Sunday morning in Jewish neighborhoods.

249.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York had a pattern and practice of not enforcing non-hour specific parking regulations from Friday evening to Sunday morning in Jewish neighborhoods.

250.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York had a pattern and practice of enforcing non-hour specific parking regulations from Friday evening to Sunday morning in non-Jewish neighborhoods.

251.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York had a pattern and practice not to enforce parking violations for vehicles at a hydrant, expired inspection sticker, expired registration sticker, no parking and no standing anytime zones in Jewish neighborhoods.

252.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York had a pattern and practice to enforce parking violations for vehicles at a hydrant, expired inspection sticker, expired registration sticker, no parking and no standing anytime zones in non Jewish neighborhoods.

253.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York only had Night Time Regulation Zones which applied on Fridays and Saturdays in non-Jewish neighborhoods.

254.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York did have any Night Time Regulation Zones which applied on Fridays and Saturdays in Jewish neighborhoods.

255.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York from Friday evenings to Sunday morning did not tow vehicles for parking violations in Jewish neighborhoods.

256.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York from Friday evenings to Sunday morning did tow vehicles for parking violations in non-Jewish neighborhoods.

257.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the City of New York charged motorists of vehicles towed on Saturdays a tow fee and a storage fee.

258.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the defendant City of New York from Friday evenings to Sunday morning did not permit Marshall towing of vehicles in Jewish neighborhoods.

259.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the defendant City of New York from Friday evenings to Sunday morning did permit Marshall towing of vehicles in non-Jewish neighborhoods.

260.     One example of the defendants and City of New York's discriminatory enforcement of parking rules is in Crown Heights.

261.     Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County is commonly referred to as the neighborhood Crown Heights.

262. Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County is a public roadway.

263. Kingston Avenue between Empire Boulevard and Eastern Parkway is a Jewish neighborhood.

264. Kingston Avenue between Empire Boulevard and Eastern Parkway is called Crown Heights.

265. Kingston Avenue between Empire Boulevard and Easter Parkway is near the vicinity of the tragic death of Cavin Cato.

266. On Kingston Avenue between Eastern Parkway and Empire Boulevard is the Jewish Children's Museum.

267. On Kingston Avenue between Eastern Parkway and Empire Boulevard is the home of the deceased rabbi's Menachem Mendel Schneerson's home.

268. Kingston Avenue between Eastern Parkway and St. Johns Place is an African American, person of color neighborhood.

269. The Defendants and the City of New York does not enforce street cleaning regulations on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway.

270. The Defendants and the City of New York does not require parking meters be activated on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway.

271. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York does not enforce street cleaning regulations on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway.

272.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York does not require parking meters be activated on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway.

273.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York does not enforce street cleaning regulations on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway and the Defendants did this for the betterment of the Jewish community.

274.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York does not require parking meters be activated on Saturdays on Kingston Avenue between Empire Boulevard and Eastern Parkway and the Defendants did this for the betterment of the Jewish community.

275.     In the Jewish neighborhood the Defendants and defendant City of New York only enforces street cleaning regulations and only requires meters be activated 5 days a week on Kingston Avenue between Empire Boulevard and Eastern Parkway in the City of New York.

276.     But, in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does enforce street cleaning regulations.

277.     But, in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does require parking meters be activated.

278.     But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does enforce street cleaning regulations.

279.     But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does require parking meters be activated.

280.     But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does enforce street cleaning regulations 6 days a week.

281.     But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the non-Jewish neighborhood on Kingston Avenue between Eastern Parkway and St. Johns Place on Saturdays the Defendants and defendant City of New York does require parking meters be activated 6 days a week.

282.     Defendant City of New York's Department of Transportation manufactured signs for traffic and parking on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

283.     Defendant City of New York's Department of Transportation posted signs for traffic and parking on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

284. Defendant City of New York's Department of Transportation maintains signs for parking on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

285. But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the Jewish neighborhood on Kingston Avenue between Empire Boulevard and Eastern Parkway because of the policies and procedures of the Defendants and the City of New York the parking regulations only applied Monday through Fridays.

286. But in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 in the Jewish neighborhood on Kingston Avenue between Empire Boulevard and Eastern Parkway the parking regulations only applied Monday through Fridays in the Jewish neighborhood on Kingston Avenue between Empire Boulevard and Eastern Parkway the street cleaning regulations were not enforced on Saturdays.

287. On Kingston Avenue between Empire Boulevard and Eastern Parkway the Defendants and the City of New York does not require Jewish American motorists to move their vehicles on Saturdays for Street Cleaning regulations.

288. On Kingston Avenue between Empire Boulevard and Eastern Parkway the Defendants and the City of New York did not require Jewish American motorists to move their vehicles on Saturdays for Street Cleaning regulations.

289. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Empire Boulevard and Eastern Parkway the Defendants and the City of New York did not require Jewish American motorists to move their vehicles on Saturdays for Street Cleaning regulations.

290.    In the Jewish neighborhood on Kingston Avenue between Empire Boulevard and Eastern Parkway the parking meters did not need to be activated on Saturdays.

291.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 defendants regulated traffic and parking on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

292.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 Defendant City of New York's Department of Transportation posted signs for traffic and parking regulations on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

293.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 Defendant City of New York's Department of Transportation maintained signs for parking on Kingston Avenue between Empire Boulevard and St. Johns Place in Kings County.

294.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Empire Boulevard and Montgomery Street on the odd number side of Kingston Avenue the defendant City posted parking sign for meters is "Monday thru Friday 8:30 a.m. to 7 p.m.".

295.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Empire Boulevard and Montgomery Street on the odd number side of Kingston Avenue the defendant City maintained parking signs for meters is "Monday thru Friday 8:30 a.m. to 7 p.m.".

296.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Montgomery Street and Crown Street on the odd number side of

Kingston Avenue the defendant City posted parking sign for meters is "Monday thru Friday 8:30 a.m. to 7 p.m.".

297.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Montgomery Street and Crown Street on the odd number side of Kingston Avenue the defendant City maintained parking sign for meters is "Monday thru Friday 8:30 a.m. to 7 p.m.".

298.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Crown Street and Carroll Street on the odd number side of Kingston Avenue the defendant City's posted parking meter signs for meters is " 1 hour parking, Monday thru Friday 8:30 a.m. to 7 p.m.".

299.    In 2003, 204, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between President Street and Union Street on the odd number side of Kingston Avenue the defendant City's posted parking meter signs for meters is "1 hour parking, Monday thru Friday 8:30 a.m. to 7 p.m.".

300.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Union Street and Eastern Parkway on the odd number of Kingston Avenue the defendant City's posted parking meter signs for meters is "1 hour parking, Monday thru Friday 8:30 a.m. to 7 p.m.".

301.    In 2003, 2004, 2005, 2006, 2007 2008, 2009, 2010, 2011, 2012, 2013, and 2014 on Kingston Avenue between Montgomery Street and Crown Street on the even number side of Kingston Avenue the Defendant City's posted parking meter signs for meters is "2 hour parking, Monday thru Friday 9 a.m. to 7 p.m.".

302.    Nostrand Avenue between Empire Boulevard and St. John's Avenue which runs parallel to Kingston Avenue and is a few blocks west of Kingston Avenue is a African American commercial district that on Saturdays requires meters to be activated and vehicles to be moved for street cleaning making it more costly for residents to engage in commercial activity.

303.    Utica Avenue, between Empire Boulevard and St. John's Avenue, which runs parallel to Kingston Avenue and is a few blocks west of Kingston Avenue is a African American commercial district that on Saturdays requires meters to be activated and vehicles to be moved for street cleaning.

304.    Nostrand Avenue is a few blocks from Kingston Avenue.

305.    Nostrand Avenue, between Empire Boulevard and St. John's Place, runs parallel to Kingston Avenue and is a few blocks west of Kingston Avenue is a African American commercial district.

306.    The Defendants and City of New York requires motorists to activate the parking meters six days a week, including Saturday, on Nostrand Avenue between Empire Boulevard and St. Johns Place.

307.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and City of New York required motorists to activate the parking meters six days a week, including Saturday, on Nostrand Avenue between Empire Boulevard and St. Johns Place.

308.    The Defendants and City of New York requires motorists to move their vehicles for Street Cleaning regulations on Saturdays, between Empire Boulevard and St. Johns Place.

309.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and City of New York required motorists to move their vehicles for Street Cleaning regulations on Saturdays, between Empire Boulevard and St. Johns Place.

310.     Utica Avenue is a few blocks from Kingston Avenue.

311.     Utica Avenue, between Empire Boulevard and St. John's Place, runs parallel to Kingston Avenue and is a few blocks east of Kingston Avenue is a African American commercial district.

312.     The Defendants and City of New York requires motorists to activate the parking meters six days a week, including Saturday, on Utica Avenue between Empire Boulevard and St. Johns Place.

313.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and City of New York required motorists to activate the parking meters six days a week, including Saturdays on Utica Avenue, between Empire Boulevard and St. Johns Place.

314.     The Defendants and City of New York requires motorists to move their vehicles for Street Cleaning regulations on Saturdays, between Empire Boulevard and St. Johns Place.

315.     In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and City of New York required motorists to move their vehicles for Street Cleaning regulations on Saturdays, between Empire Boulevard and St. Johns Place.

316.     Utica Avenue between Empire Boulevard and St. John's Avenue which runs parallel to Kingston Avenue and is a few blocks west of Kingston Avenue is a African American commercial district that on Saturdays requires meters to be activated and vehicles to be moved for street cleaning making it more costly for residents to engage in commercial activity.

317. The Defendants and the City of New York's pro-Jewish discriminatory parking rules in Crown Heights were established by the defendants to establish preferential treatment for Jewish motorists over African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

318. The Defendants and the City of New York's discriminatory enforcement of parking rules in Crown Heights caused African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikhs Americans, agnostics and atheists to incur additional costs, expenses and stress.

319. The Defendants and the City of New York continued the pattern and practice of discriminatory parking rules in favor of Jewish Americans outside Crown Heights.

320. The Defendants and the City of New York continued the pattern and practice of discriminatory parking rules in favor of Jewish Americans in Williamsburg, Brooklyn.

321. For example the Defendants and the City of New York on Lee Avenue established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from activating parking meters on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

322. In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York on Lee Avenue established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from activating parking meters on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

323. The Defendants and the City of New York on Lee Avenue established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from

40

moving their vehicles for Street Cleaning Regulations on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

324.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York on Lee Avenue established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from moving their vehicles for Street Cleaning Regulations on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

325.    Near Lee Avenue in Williamsburg is Broadway.

326.    Broadway is a primarily an African American, Hispanic, Non-Jewish Caucasian, Christian, Muslim commercial district.

327.    The Defendants and the City of New York requires motorists on Broadway to activate the parking meters six days a week, including Saturdays.

328.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014 the Defendants and the City of New York required motorists on Broadway to activate the parking meters six days a week, including Saturdays.

329.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014 the Defendants and the City of New York required motorists on Broadway to activate the parking meters six days a week, including Saturdays impacts the commercial activity of African American, Hispanic, Non-Jewish Caucasian, Christian, Muslim commercial district.

330.    The Defendants and the City of New York requires motorists on Broadway to move their vehicles on Saturday for Street Cleaning Regulations.

331.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014 the Defendants and the City of New York required motorists on Broadway to move their vehicles on Saturdays for Street Cleaning Regulation.

332.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014 the Defendants and the City of New York required motorists on Broadway to move their vehicles on Saturdays for Street Cleaning Regulations.

333.    The Defendants and the City of New York extended their preferential discriminatory preferences to Jewish Americans in other areas of Williamsburg by not requiring Jewish Americans to activate parking meters on Saturdays.

334.    The Defendants and the City of New York extended their preferential discriminatory preferences to Jewish Americans in other areas of Williamsburg by not requiring Jewish Americans to move their vehicles for Street Cleaning Regulations.

335.    The Defendants and the City of New York's discriminatory policies and practices of the enforcement of parking regulations impacted the other Non-Jewish areas of Williamsburg and impacted the commercial activity in those areas.

336.    The Defendants and the City of New York's pro-Jewish discriminatory parking rules in Williamsburg were established by the defendants to establish preferential treatment for Jewish motorists over African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

337.    The Defendants and the City of New York's discriminatory enforcement of parking rules in Williamsburg caused African Americans, Hispanic Americans, Asian Americans, Non-Jewish

Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikhs Americans, agnostics and atheists to incur additional costs, expenses and stress.

338.    The Defendants and the City of New York did not limit their discriminatory enforcement of parking rules to Crown Heights and Williamsburg,

339.    The Defendants and the City of New York continued the pattern and practice of discriminatory parking rules in favor of Jewish Americans in Borough Park, Brooklyn.

340.    For example the Defendants and the City of New York on 16th Avenue between 51st Street and 47th Street established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from activating parking meters on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

341.    In fact, the Defendants and the City of New York on 16th Avenue between 51st Street and 47th Street established discriminatory rules in favor of Jewish Americans by ending parking meters rules at 7 p.m. Monday through Thursday and on Friday's ended parking meter rules to 5 p.m..

342.    In 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 the Defendants and the City of New York on 16th Avenue between 51st Street and 47th Street established discriminatory rules in favor of Jewish Americans by ending parking meters rules at 7 p.m. Monday through Thursday and on Friday's ended parking meter rules to 5 p.m..

343.    The Defendants and the City of New York on 16th Avenue between 51st Street and 47th Street established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from moving their vehicles for Street Cleaning Regulations on Saturdays on Lee Avenue between Wilson Street and Rutledge Street.

43

344.    The Defendants and the City of New York require non-Jewish areas near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays.

345.    For example, The Defendants and the City of New York require Muslim, non-Jewish Caucasians, African Americans, Hispanics and Asians on Coney Island Avenue areas near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays.

346.    For example, The Defendants and the City of New York require Asians and Hispanic Americans, Muslims in Sunset Park near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays

347.    The Defendants and the City of New York require non-Jewish areas near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays.

348.    For example, The Defendants and the City of New York require Muslim, non-Jewish Caucasians, African Americans, Hispanics and Asians on Coney Island Avenue areas near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays.

349.    For example, The Defendants and the City of New York require Asians and Hispanic Americans, Muslims in Sunset Park near Borough Park to activate parking meters six days a week, including Fridays after 5 p.m. and Saturdays.

350.    The Defendants and the City of New York's pro-Jewish discriminatory parking rules in Borough Park were established by the defendants to establish preferential treatment for Jewish motorists over African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

351.    The Defendants and the City of New York's discriminatory enforcement of parking rules in Borough Park caused African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikhs Americans, agnostics and atheists to incur additional costs, expenses and stress.

352.    The Defendants and the City of New York did not limit their discriminatory enforcement of parking rules to Crown Heights, Williamsburg, and Borough Park.

353.    The Defendants and the City of New York continued the pattern and practice of discriminatory parking rules in favor of Jewish Americans in Flushing, Queens.

354.    For example the Defendants and the City of New York on Main Street between 72nd Avenue and 73rd Avenue established discriminatory parking rules in favor of Jewish Americans by exempting Jewish Americans from activating parking meters on Saturdays.

355.    Nearby non-Jewish Queens neighborhoods required non-Jewish motorists to activate parking meters six days a week, including Saturdays.

356.    The Defendants and the City of New York's pro-Jewish discriminatory parking rules in Flushing were established by the defendants to establish preferential treatment for Jewish motorists over African American, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

357.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein

358.    The defendants violated the RICO Act.

359.    The defendants acted in concert to violate RICO.

360.    The defendants engaged in fraud, theft, bribery, the obstruction of justice, wire fraud, mail fraud, tax evasion, grand larceny, coercion, civil rights violations, religious discrimination, violation of the Fair Housing act by acting in concert in the creation, perpetuation of a criminal enterprise.

361.    The defendants engaged in fraud.

362.    The defendants engaged in theft.

363.    The defendants engaged in bribery.

364.    The defendants engaged in obstruction of justice.

365.    The defendants engaged in wire fraud.

366.    The defendants engaged in mail fraud.

367.    The defendants engaged in tax evasion.

368.    The defendants engaged in grand larceny.

369.    The defendants engaged in coercion.

370.    The defendants engaged in civil rights violations of racial discrimination.

371.    The defendants engaged in civil rights violations of religious discrimination.

372.    The defendants engaged in wanton disregard and in violation of the Fair Housing Act.

373.    The defendants acted in concert in the RICO enterprise.

374.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists to the benefit of Jewish neighborhoods.

375.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists to the benefit of Jewish persons.

376.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists to the benefit of the Jewish Americans who received all the benefits of New York City government but were exempt from some of the laws.

377.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists to the benefit of the Jewish religion.

378.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists to the benefit of Jewish businesses.

379.   The defendants acted in concert to create a policy to tax and punish African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian

Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists to the benefit of Jewish landlords.

380.    The defendants' failed to disclose to the New York City public that they exempted Jewish persons, neighborhood and businesses from New York City Parking regulations.

381.    The defendants' failed to disclose to the New York City public that they exempted Jewish persons, neighborhood and businesses from New York City Parking regulations from Friday afternoon until Monday morning.

382.    The Defendants' intentionally did not offer to African American communities the same parking privileges that were offered to Jewish neighborhoods.

383.    The defendant's intentionally did not offer to Hispanic communities the same parking privileges that were offered to Jewish neighborhoods.

384.    The defendant's intentionally did not offer to Asian communities the same parking privileges that were offered to Jewish neighborhoods.

385.    The defendant's intentionally did not offer to Muslim communities the same parking privileges that were offered to Jewish neighborhoods.

386.    The defendant's intentionally did not offer to Christian communities the same parking privileges that were offered to Jewish neighborhoods.

387.    The defendant's intentionally did not offer to non-Jewish Caucasian communities the same parking privileges that were offered to Jewish neighborhoods.

388.    The defendant's intentionally did not offer to Hindu communities the same parking privileges that were offered to Jewish neighborhoods.

389.    The defendant's intentionally did not offer to Sikh communities the same parking privileges that were offered to Jewish neighborhoods.

390.    The defendant's intentionally did not offer to agnostic communities the same parking privileges that were offered to Jewish neighborhoods.

391.    The defendant's intentionally did not offer to atheist communities the same parking privileges that were offered to Jewish neighborhoods.

392.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to African Americans.

393.    Then defendants used the force of the City of New York to collect the parking ticket fines from African Americans.

394.    The defendants used the agents of the City of New York to collect the parking ticket fines from African Americans.

395.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to Hispanics.

396.    Then defendants used the force of the City of New York to collect the parking ticket fines from Hispanics.

397.    The defendants used the agents of the City of New York to collect the parking ticket fines from Hispanics.

398.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to Asians.

399.    Then defendants used the force of the City of New York to collect the parking ticket fines from Asians.

400.    The defendants used the agents of the City of New York to collect the parking ticket fines from Asians.

401.    Through the unlawful enforcement of New York City ·Parking regulations defendants through deception issued parking tickets to Muslims.

402.    Then defendants used the force of the City of New York to collect the parking ticket fines from Muslims.

403.    The defendants used the agents of the City of New York to collect the parking ticket fines from Muslims.

404.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to Christians.

405.    Then defendants used the force of the City of New York to collect the parking ticket fines from Christians.

406.    The defendants used the agents of the City of New York to collect the parking ticket fines from Christians.

407.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to atheists.

408.    Then defendants used the force of the City of New York to collect the parking ticket fines from atheists.

409.    The defendants used the agents of the City of New York to collect the parking ticket fines from atheists.

410.    Through the unlawful enforcement of New York City Parking regulations defendants through deception issued parking tickets to agnostics.

411.    Then defendants used the force of the City of New York to collect the parking ticket fines from agnostics.

412.    The defendants used the agents of the City of New York to collect the parking ticket fines from agnostics.

413.    The defendants offered Jewish neighborhoods the exemption from parking regulations in exchange for political support.

414.    The defendants offered Jewish neighborhoods the discriminatory preferential exemption from the parking regulations in exchange for voting support.

415.    The defendants used the discriminatory enforcement of the parking regulations to prevent African Americans from being treated fairly.

416.    The defendants used the discriminatory enforcement of the parking regulations to prevent African Americans from having justice.

417.    The defendants used the discriminatory enforcement of the parking regulations to prevent Hispanics from being treated fairly.

418.    The defendants used the discriminatory enforcement of the parking regulations to prevent Hispanics from having justice.

419.    The defendants used the discriminatory enforcement of the parking regulations to prevent Asians from being treated fairly.

420.    The defendants used the discriminatory enforcement of the parking regulations to prevent Asians from having justice.

421.    The defendants used the discriminatory enforcement of the parking regulations to prevent Muslims from being treated fairly.

422.     The defendants used the discriminatory enforcement of the parking regulations to prevent Muslims from having justice.

423.     The defendants used the discriminatory enforcement of the parking regulations to prevent Christians from being treated fairly.

424.     The defendants used the discriminatory enforcement of the parking regulations to prevent Christians from having justice.

425.     The defendants used the internet to receive wire payments for parking ticket fines for tickets issued to vehicles in non-Jewish neighborhoods.

426.     The defendants used the internet to receive wire payments for tow fees for tickets issued to vehicles in non-Jewish neighborhoods.

427.     The defendants used the internet to receive wire payments for late penalties for tickets issued to vehicles in non-Jewish neighborhoods

428.     The defendants used the mail to receive payments for parking ticket fines for tickets issued to vehicles in non-Jewish neighborhoods.

429.     The defendants used the mail to receive payments for tow fees for tickets issued to vehicles in non-Jewish neighborhoods.

430.     The defendants used the mail to receive payments for late penalties for tickets issued to vehicles in non-Jewish neighborhoods

431.     The defendants used the discriminatory exemption of parking regulations for Jewish neighborhoods as a method to exempt Jewish persons from the tax of parking fines.

432.     The defendants used the discriminatory exemption of parking regulations for Jewish neighborhoods as a method to exempt Jewish persons from the tax of parking ticket late fees.

433.     The defendants used the discriminatory exemption of parking regulations for Jewish neighborhoods as a method to exempt Jewish persons from the tax of tow fees.

434.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from African American motorists.

435.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against African American motorists and permitted the defendants to collect millions of dollars from African American motorists under the color of the law.

436.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Hispanic motorists.

437.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against Hispanic motorists and permitted the defendants to collect millions of dollars from Hispanic motorists under the color of the law.

438.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Asian motorists.

439.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against African Americans, Hispanic Americans, Asian Americans, Non-

Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists motorists and permitted the defendants to collect millions of dollars from African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheist motorists under the color of the law.

440.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists motorists.

441.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against Muslim motorists and permitted the defendants to collect millions of dollars from Muslim motorists under the color of the law.

442.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Sikh motorists.

443.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against Sikh motorists and permitted the defendants to collect millions of dollars from Sikh motorists under the color of the law.

444.    The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Non-Jewish Caucasian motorists.

445.    The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against Non-Jewish Caucasian motorists and permitted the defendants to collect millions of dollars from Non-Jewish Caucasian motorists under the color of the law.

446.    The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Hindu motorists.

447.    The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against Hindu motorists and permitted the defendants to collect millions of dollars from Hindu motorists under the color of the law.

448.    The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from agnostic motorists.

449.    The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against agnostic motorists and permitted the defendants to collect millions of dollars from agnostic motorists under the color of the law.

450.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from Non-Jewish Caucasian motorists.

451.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against atheist motorists and permitted the defendants to collect millions of dollars from atheist motorists under the color of the law.

452.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from agnostic motorists.

453.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against African American motorists and permitted the defendants to collect millions of dollars from agnostic motorists under the color of the law.

454.     The defendants committed grand larceny by issuing parking summonses based upon the illegal enforcement of a discriminatory practice and then collected millions of dollars from atheist motorists.

455.     The defendants committed grand larceny by intentionally designing and implementing a set of parking regulations based upon the discriminatory enforcement of parking rules that discriminated against African American motorists and permitted the defendants to collect millions of dollars from atheist motorists under the color of the law.

456. The defendants operated their criminal enterprise with the use of coercive mechanisms including the issuance of parking summonses by uniformed members of the City of New York Police Department.

457. The defendants operated their criminal enterprise with the use of coercive mechanisms including the issuance of parking summonses by uniformed members of the City of New York Police Department Traffic Enforcement Division.

458. The defendants operated their criminal enterprise with the use of coercive mechanisms including the issuance of parking summonses by uniformed members of the City of New York Sanitation Traffic Enforcement Division.

459. The defendants operated their criminal enterprise with the use of coercive mechanisms including the issuance of parking summonses by uniformed members of the City of New York Parks Department.

460. The defendants operated their criminal enterprise with the use of coercive mechanisms including the implementation of onerous late penalties.

461. The defendants operated their criminal enterprise with the use of coercive mechanisms including implantation of onerous late penalty notices mailed through the United Postal Service mail.

462. The defendants operated their criminal enterprise through the use of coercive mechanisms including the onerous tow enforcement of motorists' vehicles with a mandatory surcharge City of New York enforced Tow Fee.

463.    The defendants operated their criminal enterprise through the use of coercive mechanisms including the onerous tow enforcement of motorist's vehicles with securing the towed vehicles secured at pseudo paramilitary compounds secured by armed agents of the defendants.

464.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of African Americans.

465.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of African Americans.

466.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of African Americans.

467.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Hispanic Americans.

468.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Hispanic Americans.

469.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Hispanic Americans.

470.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Asian Americans.

471.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Asian Americans.

472.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Asian Americans.

473.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Muslim Americans.

474.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Muslim Americans.

475.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Muslim Americans.

476.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Christian Americans.

477.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Christian Americans.

478.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Christian Americans.

479.   The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Sikh Americans.

480.   The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Sikh Americans.

481.   The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Sikh Americans.

482.   The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of Non-Christian Caucasian Americans.

483.   The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of Non-Christian Caucasian Americans.

484.   The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of Non-Christian Caucasian Americans.

485.   The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of agnostic Americans.

486.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to African Americans to the detriment of agnostic Americans.

487.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of agnostic Americans.

488.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of equal protection under the law and engaged in civil rights violations of atheist Americans.

489.    The defendants employed their criminal enterprise to systematically engage in the intentional deprivation of the United States and New York State Constitutional civil rights protections afforded to atheist Americans to the detriment of atheist Americans.

490.    The defendants employed their criminal enterprise to create and perpetuate an apartheid state with uses the law to violate and nullify the civil rights of atheist Americans.

491.    The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of African Americans.

492.    The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of African Americans.

493. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Hispanic Americans.

494. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Hispanic Americans.

495. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Asian Americans.

496. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Asian Americans.

497. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of non-Jewish caucasian Americans.

498. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of non-Jewish Caucasian Americans.

499. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Muslim Americans.

500. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Muslim Americans.

501. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Sikh Americans.

502. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Sikh Americans.

503. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Hindu Americans.

504. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Hindu Americans.

505. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of Christian Americans.

506. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of Christian Americans.

507. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of agnostic Americans.

508. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of agnostic Americans.

509. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the detriment of atheist Americans.

510. The defendants employed their criminal enterprise to create and perpetuate in the civil rights violations by the enforcement of policies based upon religious discrimination and the violation of the Establishment Clause of the Constitution to the financial detriment of atheist Americans.

511.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods.

512.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods.

513.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks.

514.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of African Americans.

515.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of African Americans

516.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of Hispanic Americans.

517.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of Hispanic Americans

518.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of Asian Americans.

519.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of Asian Americans

520.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of non-Jewish Caucasian Americans.

521.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of non-Jewish Caucasian Americans

522.    The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair

Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of Muslim Americans.

523. The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of Muslim Americans

524. The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of Sikh Americans.

525. The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of Sikh Americans.

526. The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of agnostic Americans.

527. The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of agnostic Americans

528.     The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to create ethnically concentrated Jewish neighborhoods to the detriment of atheist Americans.

529.     The defendants employed their criminal enterprise to violate the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the non-enforcement of the Fair Housing Act as to Jewish neighborhoods to the create Jewish neighborhood voting blocks to the detriment of atheist Americans

530.     Through the unlawful enforcement of New York City Parking regulations defendants through the use of force stole money from African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

531.     Because the RICO violations involved the actions of public officials violating the public trust and the fraudulent collection and distribution of the public funds the Plaintiff is entitled to City, State, and Federal whistleblower status and compensation arising therefrom.

532.     The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship

## SECOND CAUSE OF ACTION

## CONSPIRACY

533.     The defendants acted in unison as a conspiracy to create an pattern and practice of discriminatory of parking regulations where the conspirators formulated, developed and implemented preferential treatment of Jewish Americans while at the same time discriminated

68

against African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

534.    The Conspiracy created a policy and practice that intentionally excluded Jewish Americans from paying parking tickets for parking violations and paying for parking meters.

535.    The Conspiracy created a system of parking regulations where non-Jewish Americans paid parking tickets and activate the parking meters when Jewish Americans did not have too.

536.    The Conspiracy was designed and implemented to collect millions of dollars from non-Jewish Americans for parking violations and from parking meters.

537.    The Conspirators used the monies collected to pay their salaries and divvy out City contracts.

538.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from street cleaning regulations on Saturdays.

539.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from activating parking meters on Saturdays.

540.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from any hourly based parking regulations from Friday evenings until Monday.

541.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from any Night Time Regulations Friday evenings until Monday.

542.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from enforcement of hydrant parking violations, enforcement of expired registration sticker parking violations, expired inspection sticker parking  violations, parking in No Parking Zones and Parking in No Standing Zones.

543.    The defendants acted in unison as a conspiracy to create an pattern and practice of discriminatory of parking regulations where the conspirators formulated, developed and implemented preferential treatment of Jewish Americans while at the same time discriminated against African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

544.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from street cleaning regulations on Saturdays.

545.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from activating parking meters on Saturdays.

546.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department

to exempted Jewish Americans from any hourly based parking regulations from Friday evenings until Monday.

547.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from any Night Time Regulations Friday evenings until Monday.

548.    Mayor Bloomberg conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from enforcement of hydrant parking violations, enforcement of expired registration sticker parking violations, expired inspection sticker parking violations, parking in No Parking Zones and Parking in No Standing Zones.

549.    Mayor de Blasio conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from street cleaning regulations on Saturdays.

550.    Mayor de Blasio conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempt Jewish Americans from activating parking meters on Saturdays.

551.    Mayor de Blasio conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from any hourly based parking regulations from Friday evenings until Monday.

552. Mayor de Blasio conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from any Night Time Regulations Friday evenings until Monday.

553. Mayor de Blasio conspired with the Commissioners of Department of Finance, Department of Transportation, Sanitation Department and the New York City Police Department to exempted Jewish Americans from enforcement of hydrant parking violations, enforcement of expired registration sticker parking violations, expired inspection sticker parking violations, parking in No Parking Zones and Parking in No Standing Zones.

554. The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship

**THIRD CAUSE OF ACTION**

**INTENTIONAL VIOLATION OF THE UNITED STATES CONSTITUION ESTABLISHMENT CLAUSE**

555. Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein

556. The defendants violated the First Amendment of the United States Constitution.

557. The defendants established Judaism as the City's religion.

558. The defendants established Judaism as the state's religion.

559. The defendants' discriminatory policy of designing parking regulations to promoted Judaism as the State religion is in violation of the establishment clause.

560. The defendants' discriminatory creation of New York City parking regulations adversely affected African Americans.

561.    The defendants' discriminatory creation of New York City parking regulations adversely affected Hispanic Americans.

562.    The defendants' discriminatory creation of New York City parking regulations adversely affected Asian Americans.

563.    The defendants' discriminatory creation of New York City parking regulations adversely affected non-Jewish Caucasian Americans.

564.    The defendants' discriminatory creation of New York City parking regulations adversely affected Christian Americans.

565.    The defendants' discriminatory creation of New York City parking regulations adversely affected Muslim Americans.

566.    The defendants' discriminatory creation of New York City parking regulations adversely affected Sikh Americans.

567.    The defendants' discriminatory creation of New York City parking regulations adversely affected agnostic Americans.

568.    The defendants' discriminatory creation of New York City parking regulations adversely affected atheist Americans.

569.    The defendants' discriminatory creation of New York City parking regulations punished the African Americans.

570.    The defendants' discriminatory creation of New York City parking regulations punished the Hispanic Americans.

571.    The defendants' discriminatory creation of New York City parking regulations punished the Asian Americans.

572.   The defendants' discriminatory creation of New York City parking regulations punished the non-Jewish Caucasian Americans.

573.   The defendants' discriminatory creation of New York City parking regulations punished the Christian Americans.

574.   The defendants' discriminatory creation of New York City parking regulations punished the Muslim Americans.

575.   The defendants' discriminatory creation of New York City parking regulations punished the Sikh Americans.

576.   The defendants' discriminatory creation of New York City parking regulations punished the agnostic Americans.

577.   The defendants' discriminatory creation of New York City parking regulations punished the atheist Americans.

578.   The defendants' discriminatory enforcement of parking regulations disproportionally taxed African Americans.

579.   The defendants' discriminatory enforcement of parking regulations disproportionally taxed Hispanic Americans.

580.   The defendants' discriminatory enforcement of parking regulations disproportionally taxed Asian Americans.

581.   The defendants' discriminatory enforcement of parking regulations disproportionally taxed non-Jewish Caucasian Americans.

582.   The defendants' discriminatory enforcement of parking regulations disproportionally taxed Christian Americans.

583. The defendants' discriminatory enforcement of parking regulations disproportionally taxed Muslim Americans.

584. The defendants' discriminatory enforcement of parking regulations disproportionally taxed Sikh Americans.

585. The defendants' discriminatory enforcement of parking regulations disproportionally taxed agnostic Americans.

586. The defendants' discriminatory enforcement of parking regulations disproportionally taxed atheist Americans.

587. The defendants' discriminatory enforcement of parking regulations disrespected African Americans.

588. The defendants' discriminatory enforcement of parking regulations disrespected Hispanic Americans.

589. The defendants' discriminatory enforcement of parking regulations disrespected Asian Americans.

590. The defendants' discriminatory enforcement of parking regulations disrespected non-Jewish Caucasian Americans.

591. The defendants' discriminatory enforcement of parking regulations disrespected Christian Americans.

592. The defendants' discriminatory enforcement of parking regulations disrespected Muslim Americans.

593. The defendants' discriminatory enforcement of parking regulations disrespected Sihk Americans.

594.    The defendants' discriminatory enforcement of parking regulations disrespected agnostic Americans.

595.    The defendants' discriminatory enforcement of parking regulations disrespected atheist Americans.

596.    The defendants' discriminatory enforcement of parking regulations subjected African Americans to second class status behind Jewish Americans.

597.    The defendants' discriminatory enforcement of parking regulations subjected African Americans to second class status behind Jewish Americans.

598.    The defendants' discriminatory enforcement of parking regulations subjected African Americans to second class status behind Jewish Americans.

599.    The defendants' discriminatory enforcement of parking regulations subjected African Americans to second class status behind Jewish Americans

600.    The defendants' discriminatory enforcement of parking regulations subjected African Americans to second class status behind Jewish Americans

601.    The defendants' discriminatory enforcement of parking regulations subjected Hispanic Americans to second class status behind Jewish Americans.

602.    The defendants' discriminatory enforcement of parking regulations subjected Asian Americans to second class status behind Jewish Americans

603.    The defendants' discriminatory enforcement of parking regulations subjected non-Jewish Caucasian Americans to second class status behind Jewish Americans.

604.    The defendants' discriminatory enforcement of parking regulations subjected Christian Americans to second class status behind Jewish Americans.

76

605.    The defendants' discriminatory enforcement of parking regulations subjected Muslim Americans to second class status behind Jewish Americans.

606.    The defendants' discriminatory enforcement of parking regulations subjected Sihk Americans to second class status behind Jewish Americans.

607.    The defendants' discriminatory enforcement of parking regulations subjected agnostic Americans to second class status behind Jewish Americans.

608.    The defendants' discriminatory enforcement of parking regulations subjected agnostic Americans to second class status behind Jewish Americans.

609.    The defendants' discriminatory enforcement of parking regulations taxed non-Jewish Americans for not being Jewish.

610.    The Defendant and City of New York's discriminatory enforcement of parking regulations unfairly taxed African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

611.    African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists all sustained damages from the Defendants and City of New York's discriminatory actions.

612.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE COMMERCE CLAUSE

613.    Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

614.    The defendants' and the City of New York discriminatory creation and enforcement of parking regulations that favored Jewish Americans adversely interfered, inhibited and impacted both intrastate and interstate commercial activity and discouraged individuals from engaging in commercial activity on Friday evenings, Saturdays and Sunday mornings in violation of the Constitution of the United States of America specifically Article 1 section 3 Commerce Clause.

615.    The defendants' and the City of New York discriminatory enforcement of parking regulations is a violation of the Equal Protection Clause.

616.    The defendants' and he City of New York discriminatory enforcement of parking regulations forces African American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

617.    The money paid by African Americans for parking meters on Saturdays was an illegal tax.

618.    The money paid by African Americans for parking meters on Saturdays was a taking of their property.

619.    The money paid by African Americans for parking meters on Saturdays was an unconstitutional taking of property.

620.    The money paid by African Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

621.    The defendant's discriminatory enforcement of parking regulations forces African American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

622. The defendants' discriminatory enforcement of parking regulations forces African Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of African Americans.

623. The defendants' discriminatory enforcement of parking regulations forces Hispanic American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

624. The money paid by Hispanic Americans for parking meters on Saturdays was an illegal tax.

625. The money paid by Hispanic Americans for parking meters on Saturdays was a taking of their property.

626. The money paid by Hispanic Americans for parking meters on Saturdays was an unconstitutional taking of property.

627. The money paid by Hispanic Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

628. The defendant's discriminatory enforcement of parking regulations forces Asian American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

629. The defendants' discriminatory enforcement of parking regulations forces Asian Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of African Americans.

630.    The defendants' discriminatory enforcement of parking regulations forces Asian American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

631.    The money paid by Asian Americans for parking meters on Saturdays was an illegal tax.

632.    The money paid by Asian Americans for parking meters on Saturdays was a taking of their property.

633.    The money paid by Asian Americans for parking meters on Saturdays was an unconstitutional taking of property.

634.    The money paid by Asian Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

635.    The defendant's discriminatory enforcement of parking regulations forces Non-Jewish Caucasian American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

636.    The defendants' discriminatory enforcement of parking regulations forces Non-Jewish Caucasian Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of Non-Jewish Caucasian Americans.

637.    The defendants' discriminatory enforcement of parking regulations forces Non-Jewish Caucasian American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

638.    The money paid by Non-Jewish Caucasian African Americans for parking meters on Saturdays was an illegal tax.

639. The money paid by Non-Jewish Caucasian Americans for parking meters on Saturdays was a taking of their property.

640. The money paid by Non-Jewish Caucasian Americans for parking meters on Saturdays was an unconstitutional taking of property.

641. The money paid by Non-Jewish Caucasian Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

642. The defendant's discriminatory enforcement of parking regulations forces Christian American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

643. The defendants' discriminatory enforcement of parking regulations forces Christian Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of Christian Americans.

644. The defendants' discriminatory enforcement of parking regulations forces Christian American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

645. The money paid by Christian Americans for parking meters on Saturdays was an illegal tax.

646. The money paid by Christian Americans for parking meters on Saturdays was a taking of their property.

647. The money paid by Christian Americans for parking meters on Saturdays was an unconstitutional taking of property.

648.     The money paid by Christian Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

649.     The defendant's discriminatory enforcement of parking regulations forces Muslim American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

650.     The defendants' discriminatory enforcement of parking regulations forces Muslim Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of Muslim Americans.

651.     The defendants' discriminatory enforcement of parking regulations forces Muslim American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

652.     The money paid by Muslim Americans for parking meters on Saturdays was an illegal tax.

653.     The money paid by Muslim Americans for parking meters on Saturdays was a taking of their property.

654.     The money paid by Muslim Americans for parking meters on Saturdays was an unconstitutional taking of property.

655.     The money paid by Muslim Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

656.     The defendant's discriminatory enforcement of parking regulations forces Sikh American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

657.    The defendants' discriminatory enforcement of parking regulations forces Sikh Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of Sikh Americans.

658.    The defendants' discriminatory enforcement of parking regulations forces Sikh American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

659.    The money paid by Sikh Americans for parking meters on Saturdays was an illegal tax.

660.    The money paid by Sikh Americans for parking meters on Saturdays was a taking of their property.

661.    The money paid by Sikh Americans for parking meters on Saturdays was an unconstitutional taking of property.

662.    The money paid by Sikh Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

663.    The defendant's discriminatory enforcement of parking regulations forces Sikh American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

664.    The defendants' discriminatory enforcement of parking regulations forces Sikh Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of agnostic Americans.

665.    The defendant's discriminatory enforcement of parking regulations forces atheist American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

666.    The defendants' discriminatory enforcement of parking regulations forces atheist Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of atheist Americans.

667.    The defendants' discriminatory enforcement of parking regulations forces atheist American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

668.    The money paid by atheist Americans for parking meters on Saturdays was an illegal tax.

669.    The money paid by atheist Americans for parking meters on Saturdays was a taking of their property.

670.    The money paid by atheist Americans for parking meters on Saturdays was an unconstitutional taking of property.

671.    The money paid by atheist Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

672.    The defendant's discriminatory enforcement of parking regulations forces atheist American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

673. The defendants' discriminatory enforcement of parking regulations forces agnostic Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities agnostic Americans.

674. The defendants' discriminatory enforcement of parking regulations forces agnostic American motorists to activate parking meters on Saturdays but exempts Jewish Americans from the same regulation.

675. The money paid by agnostic Americans for parking meters on Saturdays was an illegal tax.

676. The money paid by agnostic Americans for parking meters on Saturdays was a taking of their property.

677. The money paid by agnostic Americans for parking meters on Saturdays was an unconstitutional taking of property.

678. The money paid by agnostic Americans for parking meters on Saturdays diminished their disposable income and removed money from the economy.

679. The defendant's discriminatory enforcement of parking regulations forces Sikh American motorists to move their vehicles for street cleaning regulations on Saturday's but exempts Jewish Americans from the same regulation.

680. The defendants' discriminatory enforcement of parking regulations forces Sikh Americans to move their vehicles for street cleaning regulations on Saturdays and thereby disrupts the commercial activities of Sikh Americans.

681. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of African Americans.

682.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of African Americans in violation of the Commerce Clause of the United States Constitution.

683.    The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of African Americans in violation of the United States Constitution.

684.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Hispanic Americans.

685.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Hispanic Americans in violation of the Commerce Clause of the United States Constitution.

686.    The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of Hispanic Americans in violation of the United States Constitution.

687.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Asian Americans.

688.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Asian Americans in violation of the Commerce Clause of the United States Constitution.

689.    The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of Asian Americans in violation of the United States Constitution.

690.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of non-Jewish Caucasian Americans.

691.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of non-Jewish Caucasian Americans in violation of the Commerce Clause of the United States Constitution.

692.   The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of non-Jewish Caucasian Americans in violation of the United States Constitution.

693.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Christian Americans.

694.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Christian Americans in violation of the Commerce Clause of the United States Constitution.

695.   The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of Christian Americans in violation of the United States Constitution

696.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Muslim Americans.

697.   The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Muslim Americans in violation of the Commerce Clause of the United States Constitution.

698. The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of Muslim Americans in violation of the United States Constitution.

699. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Sikh Americans.

700. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of Sikh Americans in violation of the Commerce Clause of the United States Constitution.

701. The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of Sikh Americans in violation of the United States Constitution.

702. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of agnostic Americans.

703. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of agnostic Americans in violation of the Commerce Clause of the United States Constitution.

704. The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of agnostic Americans in violation of the United States Constitution.

705. The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of atheist Americans.

706.    The defendants' discriminatory enforcement of parking regulations interfered with interstate and intrastate commercial activity of atheist Americans in violation of the Commerce Clause of the United States Constitution.

707.    The defendants intentionally designed and implemented a policy and practice of discriminatory enforcement of parking regulations that interfered with interstate and intrastate commercial activity of atheist Americans in violation of the United States Constitution.

708.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second class citizenship.

709.    The Defendant and City of New York's discriminatory enforcement of parking regulations unfairly taxed African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

710.    African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists all sustained damages from the Defendants and City of New York's discriminatory actions.

711.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship

## FIFTH CAUSE OF ACTION

## MONELL VIOLATION OF 42 U.S.C. 1983

712.    Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

713.    Defendants by their conduct and their systematic practice and procedure formulated and instituted a policies designed to violate the plaintiff's Constitutional rights as guaranteed by the First, Fourth, Fifth, Fourteenth Amendments of the Constitution.

714.    The Defendant's and the City of New York and their agents engaged in a Constitutional Monell violation with a pattern and practice of discriminatory behavior and/or enforcement of parking meter summons and/or street cleaning tickets on Saturdays in African American, Hispanic American, Asian American, Non-Jewish Caucasian American, Christian American, Muslim Americans, Hindu Americans, Sikh Americans, agnostic and atheists.

715.    The Defendant's and the City of New York and their agents engaged in a Constitutional Monell violation with a pattern and practice of discriminatory behavior and/or enforcement of hydrant, hour specific parking regulations, nighttime regulations, inspection and registration tickets were enforced against non-Jewish Americans through out the City of New York but not enforced against Jewish Americans neighborhoods from Friday afternoon to Monday morning.

716.    The Defendant's and the City of New York and directed their agents not to ticket or tow vehicles in Jewish neighborhoods from Friday night to Monday morning.

717.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second class citizenship.

718.    The direct and proximate result of this unlawful conduct by the defendants and City of New York has caused the plaintiff see the establishment of state religion.

719.    The Defendant and City of New York's discriminatory enforcement of parking regulations unfairly taxed African Americans, Hispanic Americans, Asian Americans, Non-Jewish

90

Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

720. African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists all sustained damages from the Defendants and City of New York's discriminatory actions.

721. The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship

722. As a direct and proximate result of this unlawful conduct, plaintiffs sustained the damages hereinbefore alleged.

**SIXTH CAUSE OF ACTION CLAIM**
**VIOLATION OF THE FAIR HOUSING ACT**

723. Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

724. In furtherance of encouraging the discriminatory parking rules the defendants created Jewish neighborhoods as ethnically preferred neighborhoods.

725. In furtherance of encouraging the discriminatory parking rules the defendants created Jewish neighborhoods as religiously preferred neighborhoods.

726. In furtherance of encouraging ethnically Jewish separate neighborhoods the defendants created a governmental policy that violated the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the exempting Jewish neighborhoods to the rules and regulations applied to other New York neighborhoods.

727. The defendants created a governmental policy that violated the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the exempting Jewish neighborhoods to the rules and regulations applied to other New York neighborhoods.

728. The defendants created a governmental policy that violated the Fair Housing Act, 42 USC 3001 sections 800, 801, 802, 803, 804, 805, and 806 by the exempting Jewish neighborhoods to the parking rules and regulations applied to other New York neighborhoods

729. This City policy of preferential treatment towards Jewish neighborhoods permitted landlords in Jewish neighborhoods to disregard the governing principles of the Fair Housing Act.

730. The City permitted landlords of multiple dwellings in Jewish neighborhoods violate the Fair Housing Act by discriminating in the placement of only Jewish tenants in multiple dwellings in Jewish neighborhoods to the detriment of African Americans, Hispanics, Asians, Non Jewish Caucasians, Christians, Muslims, Sikhs, agnostics and atheists.

731. The result of the City's designing Jewish ethnic neighborhoods has resulted in African Americans, Hispanics, Asians, Non Jewish Caucasians, Christians, Muslims, Sikhs, agnostics and atheists being forced out of multiple dwelling buildings in Jewish neighborhoods.

732. The result of the City's designing Jewish ethnic neighborhoods has resulted in African Americans, Hispanics, Asians, Non Jewish Caucasians, Christians, Muslims, Sikhs, agnostics and atheists being not offered apartments in multiple dwelling buildings in Jewish neighborhoods.

733. This policy is evidenced by all Jewish multiple dwelling apartment buildings throughout the City created and sanctioned Jewish neighborhoods.

734. The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second class citizenship.

## SEVENTH CLAIM
## VIOLATION OF THE VOTING RIGHTS ACT

735.    Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

736.    The actions of the defendants to create intact isolated ethnic Jewish neighborhoods to create a political power groups and permit the over representation of Jewish Americans in elected and appointed government positions was not a random occurrence.

737.    The actions of the defendants to create intact isolated ethnic Jewish neighborhoods to create a political power groups and permit the over representation of Jewish Americans in elected and appointed government positions was the result of a deliberate plan.

738.    The defendants systematically provided Jewish Americans the special privilege of isolated neighborhoods that ensured the defendants could receive political support and financial support from Jewish Americans to the detriment of African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christians, Muslims, Sikhs, agnostics and atheists.

739.    The creation and the implementation of the discriminatory parking regulations created isolated ethnic Jewish American neighborhood and also created a Jewish American voting block.

740.    This Jewish American voting bloc enabled these Jewish neighborhoods to create political power blocks to the detriment of African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheists.

741.    This defendants' sanctioned Jewish American voting bloc enabled these Jewish neighborhoods to create political power blocks to the gain preferential treatment under governmental regulations.

742.    The Defendants and the City of New York's sanctioned Jewish American voting bloc enabled these Jewish neighborhoods to create and implement government policies designed to further increase their ethnic autonomy from the rest of New York City to the detriment to African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheists.

743.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship.

## EIGHTH CLAIM

## MALICIOUS ABUSE OF PROCESS

744.    Plaintiff repeat and re-allege each and every allegation as if fully set forth herein.

745.    Defendants intentionally used their positions of power to deny African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheists due process of the law.

746.    The defendants and the City of New York intentionally acted with malice in the design and the enforcement of the Saturday parking rules in New York City to favor Jewish Americans.

747.    The defendants motive to create favorable parking rules for Jewish Americans was to ensure political support from the Jewish American community.

748.    The defendants and the City of New York use parking summonses to exert control over African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans,

Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheist motorists.

749.    The defendants and the City of New York use parking summonses to seize the private property of African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheist motorists.

750.    The defendants and the City of New York denied non-Jewish American motorists equal protection under the laws.

751.    The defendants and the City of New York created a set of parking rules denied non-Jewish American motorists equal protection under the laws of the United States.

752.    Defendants established a system with the design and enforcement of parking rules that favored Jewish Americans is on its face discriminatory and was systematically intended to take the private property of non-Jewish American motorists.

753.    The defendants acted in concert with the denial of the equal protection of the laws to African Americans, Hispanic Americans, Asian Americans, non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics, and atheist motorists.

754.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship.

## NINTH CLAIM

## FAILURE TO INTERVENE

755.    Plaintiff repeat and re-allege each and every allegation as if fully set forth herein.

756.     Defendants and the City of New York had a Constitutional responsibility to protect the rights of the plaintiff.

757.     Defendants and the City of New York had a Constitutional responsibility to protect the rights of every motorists.

758.     Defendants took oaths of office to uphold the Constitution of the State of New York.

759.     Defendants took oaths of office to uphold the Constitution of the United States of America.

760.     Defendants took oaths of office to uphold the laws of City and State of New York.

761.     Defendants and the City of New York accepted the public trust to run the government fairly for all New Yorkers.

762.     Defendants betrayed that trust by creating, sanctioning and enforcing a discriminatory enforcement of New York City Parking rules and regulations.

763.     Defendants violated the Constitution of the United States of America creating, sanctioning and enforcing a discriminatory enforcement of New York City Parking rules and regulations.

764.     Defendants violated the New York State Constitution creating, sanctioning and enforcing a discriminatory enforcement of New York City Parking rules and regulations.

765.     All defendants violated the laws of the City and State of New York creating, sanctioning and enforcing a discriminatory enforcement of New York City Parking rules and regulations.

766.    The Defendant and City of New York's discriminatory enforcement of parking regulations unfairly taxed African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists.

767.    Defendants had the opportunity to intervene but failed to intervene.

768.    All defendants while acting in concert established a custom and practice of defrauding tens of thousands of New Yorkers out of millions of dollars to the benefit of one distinct ethnic group, Jewish Americans.

769.    All defendants had a constitutional responsibility to protect the rights and property of African Americans, Hispanic Americans, Asian Americans, Indian Americans, Non-Jewish Caucasian Americans, Christians, Muslims, Sikhs, agnostics and atheists.

770.    All defendants had a constitutional responsibility to intervene and protect the rights and property of African Americans, Hispanic Americans, Asian Americans, Indian Americans, Non-Jewish Caucasian Americans, Christians, Muslims, Sikhs, agnostics and atheists.

771.    The continual failure of the defendants to intervene has created a widespread criminal enterprise designed to defraud African Americans, Hispanic Americans, Asian Americans, Indian Americans, Non-Jewish Caucasian Americans, Christians, Muslims, Sikhs, agnostics and atheists out of millions of dollars.

772.    The defendants have created a Constitutional crisis within in the City of New York.

773.    Defendants who failed to intervene, through there passive approval of the discriminatory enforcement of the City's parking rules, violated the First, Fourth, Fifth, and

Fourteenth Amendments as well as the laws of the United States, New York State and the City of New York.

774. African Americans, Hispanic Americans, Asian Americans, Non-Jewish Caucasian Americans, Christian Americans, Muslim Americans, Hindu Americans, Sikh Americans, agnostics and atheists all sustained damages from the Defendants and City of New York's discriminatory actions.

775. The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship.

## TENTH CLAIM

## NEGLIGENT HIRING AND TRAINING

776. Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

777. Defendants and the City of New York had a duty to insure that they conducted background searches on their employees, including their commissioners.

778. Defendants and the City of New York had a duty to insure that they properly trained their employees in the understanding and the implementation of the principles of fairness embodied within the United States Constitution.

779. Defendants failed to provide training for their commissioners in upholding the Constitution of the United States.

780. Defendants failed to provide training for their commissioners in upholding the Constitution of the United States.

789.    By filing the Notice of Claim the Plaintiff did not consent to unwarranted invasions of his privacy by the defendants.

790.    By filing the Notice of Claim the Plaintiff did not consent to unwarranted infringements into his free speech.

791.    Since filing the Notice of Claim the defendants and the City of New York served unlawful interrogatories on Plaintiff that sough personal and privileged information.

792.    The defendants and the City of New York used the 50 h hearing to seek personal information on plaintiff even though the defendants and the City of New York had NO INTENTION of resolving this claim before a lawsuit was initiated.

793.    The defendants and the City of New York used the 50 h hearing as a means of intimidation of Plaintiff.

794.    The direct and proximate result of this unlawful conduct plaintiff been caused to sustain damages including lost money, stress and discomfort dealing with second-class citizenship

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request judgment against defendants as follows:

(a)  Compensatory damages against all defendants, jointly and severally;

(b)  Treble damages;

(c)  Interest for the taking of property at 9% from date of taking;

(d)  Punitive damages against the individual defendants, jointly and severally;

(e)  Whistle blower award for alerting the public of public corruption and criminal activity;

(f)  Federal whistle blower award for alerting the public of public corruption, criminal activity and the misappropriation of federal funds in the defendants criminal enterprise;

(g) State whistle blower award for alerting the public of public corruption, criminal activity and the misappropriation of City and State tax dollars in violation of the laws of the State and City of New York;

(h) Reasonable attorneys' fees and costs, past and projected, pursuant to 28 U.S.C. § 1988; and

(i) Declaratory judgment

(j) Injunctive relief

(k) Such other and further relief as this Court deems just and proper.

DATED:   ~~January 23, 2014~~   FEBUARRY  8TH 2015  O.5
         New York, New York

                    Oba Stephens

                    _Oba Sten_
                    Pro Se Plaintiff

                    2568 BEDFORD AVENUE,
                    Apartment 4a
                    BROOKLYN NEW YORK 11226
                    718-622-0704

101

# EXHIBIT A

# IN THE MATTER OF THE CLAIM OF
OBA STEPHENS

VS.

THE CITY OF NEW YORK, MAYOR DEBLASIO, JOHN AND JANE DOE 1-20
COMMISSIONERS OF THE NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY
DEPARTMENT OF TRANSPORTATION AND NEW YORK CITY DEPARTMENT OF
FINANCE AND JACK AND JUNE DOE UNKNOWN EMPLOYEE AGENTS 1-100,000

TO:
NEW YORK CITY LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NEW YORK 10007
ON BEHALF THE NEW YORK CITY COMPTROLLER'S OFFICE

1. **THE NAME AND ADDRESS OF CLAIMANT AND CLAIMANT'S
   ATTORNEY**
   **CLAIMANT:**
   OBA STEPHENS
   2568 BEDFORD AVENUE, Apartment 4a
   BROOKLYN NEW YORK

   **CLAIMANT'S ATTORNEY**
   CLAIMANT IS PRO SE BUT RESERVES THE RIGHT TO RETAIN COUNSEL AT ANY
   TIME TO REPRESENT HIS INTERESTS IN THIS CLAIM

2. **NATURE OF CLAIM:**
   FOR MONEY DAMAGES AND PUNITIVE DAMAGES FOR STATE AND
   FEDERAL CIVIL AND CONSTITUTIONAL RIGHTS VIOLATIONS PERSONAL
   INJURIES, PAIN AND SUFFERING, EMBARASSMENT, SEVERE AND
   PERPETUAL ANXIETY, HUMILIATION, EMOTIONAL AND MENTAL
   DISTRESS DUE TO THE INTENTIONAL, NEGLIGENCE, RECKLESSNESS
   AND/OR WANT OF CARE BY THE CITY OF NEW YORK, MAYOR
   DEBLASIO, JOHN/JANE DOES 1-20 COMMISSIONERS OF NEW YORK CITY
   POLICE DEPARTMENT, COMMISSIONERS OF NEW YORK CITY
   DEPARTMENT OF TRANSPORTATION, DOES 1-20 COMMISSIONERS OF
   DEPARTMENT OF FINANCE, their agents, servants, employees of the New
   York City Police Department JACK AND JUNE Does 1-100,000.
   (Hereinafter referred to as the City of New York, its Commissioners and
   its Agents)

The City of New York, its Commissioners and Agents used the aforementioned illegal and discriminatory parking regulations, collection of meter fees and issuance of parking summonses and/or parking tickets to maliciously prosecute, intimidate, harass, hinder the travel and commercial activity of non-Jewish motorists in the City of New York including targeting African American, Hispanic, Asian, Islamic and Christian ethnically mixed areas with the collection of meter fees in non-Jewish neighborhoods, the issuance of meter violations summonses and/or parking tickets and the collection of United States Currency through coercion of African Americans, Hispanics, Asians, Muslims, and Christians while intentionally exempting Jewish neighborhoods and motorists from the same. Monetary Damages and Injunctive damages are sought for this violation.

In raising and asserting this claim, I claim and assert whistleblower status under the New York State False Claims Act and Federal Whistleblower Protection Act. As a Whistleblower I seek and am entitled to protections and damages under New York and Federal Whistle blower statutes for initiating this litigation.    I am entitled to whistleblower damages. Monetary Damages are sought for this violation.

The City of New York, its Commissioners and its Agents above described actions were and remain in violation of the 42 USC 1983 for the violation of the civil rights and due process rights of African Americans, Hispanics, Asians, Muslims and Christians and in violation 42 USC 1981 for the denial of Equal Rights under the law to African Americans, Hispanics, Asians, Muslims and Christians.    The above described discriminatory actions of the City of New York, its Commissioners and its agents violates the 5th, the 14th Amendment, and violates the 15th Amendment. Monetary Damages and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents engaged in a Constitutional Monell violation, of a pattern and practice of discriminatory behavior and/or enforcement that required activating parking meters on Saturdays and for the issuance of parking meter summons and/or parking tickets on Saturdays in African American, Hispanic, Asian, Muslim and Christian neighborhoods and/or motorists for parking meter regulations on Saturdays in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014.    Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents engaged in a Monell violation of a pattern and practice of discriminatory behavior and/or enforcement for street cleaning summons and/or parking tickets on Saturdays in African American, Hispanic, Asian, Muslim and Christian

neighborhoods and/or motorists for street cleaning regulations on Saturdays in 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014. Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners, and its Agents engaged in a discriminatory behavior that interfered, inhibited, and impacted interstate and intrastate commercial activity. The City's discriminatory policy and practice was and remains in violation of the United States Constitution Article 1 Section 3 commonly referred to as the Commerce Clause. The discriminatory activity by the City directly interfered with and impeded interstate commercial activity and discouraged motorists from engaging in or participating in commercial activity on Saturdays. Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners, and its Agents engaged in and established discriminatory behavior that was and remains in violation of the First Amendment of United States Constitution and its Establishment of Religion Clause.  The City of New York, its Commissioners, and its Agents established a preferential religion, a state religion of Judaism to the permanent detriment of African Americans, Hispanics, Asians, Muslims and Christians. The City of New York violates the First Amendment Freedom of Speech and Free Exercise Clause. Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents engaged in discriminatory actions in violation of 18 USC 1862-1968 commonly referred to as RICO, the Racketeering Influence and Corrupt Organizations Act. The actions and pattern and behavior of the City of New York, its Commissioners and its Agents was based upon a conspiracy to benefit Jewish neighborhoods to discriminate against African Americans, Hispanics, Asians, Muslim and Christian neighborhoods. The City of New York', its Commissioners and agents actions were based on fraud in the enforcement of laws for the purpose of extortion of funds and/or collection of funds and property from African American, Hispanic, Asian, Muslim and Christian persons. Included in this RICO act were elected and appointed Jewish officials and community leaders who acted for the benefit of Jewish persons and to the detriment of persons of African American, Hispanic, Asian, Muslim and Christians.  Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents engaged in discriminatory actions violation of the Civil Rights Act of 1968, also know as the Fair Housing Act.  In that the City of New York and their Commissioners and Agents and Servants developed and implemented policies and practices that encouraged, created, fostered a racially and

ethnically distinct groups of Jewish neighborhoods that were afforded separate and distinct less restrictive rules and regulations, subject to separate and distinct less monetary costs and expenses, and subject to separate and distinct less fines and penalties than in other racially and ethnically integrated neighborhoods throughout the City of New York. While non Jewish African American, Hispanic, Asian, Islamic and Christian neighborhoods were targeted for rules, regulations and fines not levied against Jewish Neighborhoods. This violation of the Fair Housing Act has led to and perpetuated Jewish enclaves of Jewish lifestyle and practices and created distinct and powerful voting blocks for Jewish residents throughout the City.   Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents engaged in discriminatory actions violation of the Voting Rights Act of 1965 and the 14th and 15 Amendment.   In that the City of New York and their Commissioners and Agents and Servants developed and implemented policies and practices that encouraged, created, fostered a racially and ethnically distinct groups of Jewish neighborhoods and diluted the political power and organization of other integrated non-Jewish neighborhoods.   Jewish neighborhoods were afforded separate and distinct less restrictive rules and regulations, subject to separate and distinct less monetary costs and expenses, and subject to separate and distinct less fines and penalties than in other racially and ethnically integrated neighborhoods throughout the City of New York. While non Jewish African American, Hispanic, Asian, Islamic and Christian ethnically mixed areas were prevented from creating isolated voting blocks so their individual political power bases were diluted. While non Jewish African American, Hispanic, Asian, Islamic and Christian ethnically mixed areas were targeted for rules, regulations and fines not levied against Jewish Neighborhoods. This violation of the Voting Rights Act has led to and perpetuated Jewish enclaves of Jewish lifestyle and practices and created distinct and powerful voting blocks for Jewish residents throughout the City to the detriment and harm of ethnically missed neighborhoods. Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents had a duty to intervene and protect the rights of African Americans, Hispanics, Asians, Muslims and Christian persons from the unconstitutional, discriminatory and preferential treatment afforded to Jewish neighborhoods but intentionally conspired to disregard their duty to intervene. The City of New York, its Commissioners, and its Agents have a on going and continual duty to protect the rights of all persons and they failed to protect the rights of all persons.   This was to the detriment of African Americans, Hispanics, Asians, Muslims and Christians.  And in addition to the harmful financial hardship heaped on African Americans, Hispanics,

Asians, Muslims and Christians they relegated these persons to second class citizenship with blatant de jure and de facto discrimination to the psychological detriment of millions of persons.     Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents designed, organized, implemented the criminal enforcement of rules and regulations against African Americans, Hispanics, Asians, Islamic and Christian neighborhoods with the exemption for the benefit of a specific group, Jewish people.  The City of New York and their Commissioners and agents and servants criminally enforced the parking rules to illegally seize, take and confiscate private property and money.  The City of New York denied the due process rights and equal protections of the laws to African Americans, Hispanics, Asians, Muslims and Christians.  Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents illegally confiscated and without justification took money, personal property including but not limited to motor vehicles, bank accounts and wages from claimant and a yet to be determined class.  Claimant and class are entitled to damages for the property taken and statutory interest for the unjust taking.  The statutory interest rate for property claims is 9%.  Damages are sought for this violation.  Monetary and Injunctive Damages are sought for this violation.

The City of New York was negligent in it's hiring, training, retention and supervision of it's Commissioners, its managers in violation of relevant Statutes and Case law of the United State Supreme Court and the New York State Court of Appeals in that the City of New York and their Commissioners and Agents and Servants developed and implemented policies and practices that violated the Constitution the 1st, 4th, 5th, and 8th Amendments and violations outlined above. Monetary and Injunctive Damages are sought for this violation.

The City of New York, its Commissioners and its Agents intentionally destroyed the rights of African Americans, Hispanics, Asians, Muslims and Christians to enjoy their weekends in peace and harmony by harassing them with street cleaning rules and penalties, harassing them with meter fees, and harassing them with meter fines and penalties.  The City of New York targeted African American, Hispanic, Asian, Muslim and Christian ethnically diverse neighborhoods for meters and street cleaning regulations as a revenue source for the City's unconstitutional policy. The City's policy has created a stressful environment that Jewish neighborhoods do not experience.  Monetary and Injunctive Damages are sought for this violation.

**3.** **The time and manner in which the claim arose:**

The claim arose on or about SATURDAY May 24, 2014 when Oba Stephens was issued two parking tickets for vehicle NYS FRA2943 at approximately 7:46 a.m. for street cleaning and at approximately 9:21 a.m. for meter violation at or about the vicinity of 252 Kingston Avenue and 250 Kingston Avenue respectfully, Brooklyn New York which is just a few blocks where the African American child Gavin Cato was killed by a reckless NYPD escorted Jewish motorcade over 20 years ago. The claim arose because on the north side of Eastern Parkway on Kingston Avenue African American, Hispanic, Asian, Muslim and Christian motorists are required to move their vehicles for street cleaning and required to activate parking meters on SATURDAY; but on the south side of Eastern Parkway on Kingston Avenue in a Jewish neighborhood street cleaning and parking meters are in not effect on SATURDAY, in fact the New York City Department of Transportation Signs specifically say not in effect. The damages are ongoing because the City of New York has issued tens of thousands of parking tickets for meter violations and street cleaning violations since 2003 when this policy and program was instituted. Additionally, Claimant has been forced to activate meters on SATURDAYS on hundred's if not thousands of occasions. The class of motorists who have been adversely affected and required to active meters or been subject to summons and/or parking tickets for Saturday Street Cleaning and Parking Meters has yet to be ascertained.

4. The Items of damages or injuries claimed are:

Claimant sustained injuries to his emotional well-being, the extent of which is as yet not fully determined. Claimant claims damages to his emotional well being, to the quality of his life, damages for pain and suffering, financial hardship, punitive damages, special damages the exact extent of which have not as yet been fully determined. Statutory damages under the Whistle Blowing Statutes, Constitutional and Statutory damages including punitive damages, treble damages, statutory interest rates, and attorney's fees. Individually named Officials and Commissioners will be subject to punitive damages. Claimant alleges class action recovery damages. Damages under 42 USC 1983. Damages are 10 Million Dollars.

That said claim and demand is hereby presented for adjustment and payment. You are hereby notified that unless it is adjusted and paid within the time

provided by law from the date of presentation to you, the claimant intends to commence an action on this claim.

Dated June 3, 2014

New York, New York

_____

Signature

_____

Print Name

STATE OF NEW YORK COUNTY OF NEW YORK

COUNTY OF NEW YORK

I OBA STEPHENS, am the CLAIMANT in the above-entitled action.  I have read the foregoing complaint and the contents thereof.  The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____

Sworn to before me on this day of June  2014.

Notary Public

_____

*Due and timely service is hereby admitted.*

*New York, N.Y.* .........................................................., *200......*

........................................................................ *Esq.*

*Attorney for*..........................................................................

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

OBA STEPHENS,

Plaintiff,

-against-

CITY OF NEW YORK; NEW YORK CITY
MAYORS  BILL DE BLASIO; MICHAEL
BLOOMBERG; ELECTED OFFICIALS JOHN
DOE 1 through 20 and JANE DOE 21 through 40,
individually and in their official capacities, NEW
YORK CITY POLICE COMMISSIONERS
RAYMOND KELLY AND WILLIAM
BRATTON, POLICE OFFICERS JAMES DOE 1
through 20,000 AND JUNE DOE 20,001 through
50,0000, individually and in their official capacities,
NEW YORK CITY DEPARTMENT OF
TRANSPORTATION COMMISSIONERS IRIS
WEINSHALL,  JANETTE SADIK-KHAN, NEW
YORK CITY POLLY TROTTENBERG, NEW
YORK CITY DEPARTMENT OF FINANCE
COMMISSIONERS MARTHA STARK,
MICHAEL HYMAN, DAVID FRANKEL, BETH
GOLDMAN, JACQUES JIHA, and NEW YORK
CITY DEPARTMENT OF SANITATION
COMMISSIONER KATHRYN GARCIA,

Defendants.

## COMPLAINT

*OBA STEPHENS*

*PRO SE LITIGANT*

Service List

Mayor De Blasio
Office of Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007

Mayor Michael Bloomberg
Office of Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007

Police Commissioner Bratton
New York City Police Department
One Police Plaza
New York, New York 10038

Police Commissioner Kelly
New York City Police Department
Once Police Plaza
New York, New York 10038

Commissioner Iris Weinshall
New York City Department of Transportation
55 Water Street
New York, New York 10007

Commissioner Janette Sadik Khan
New York City Department of Transportation
55 Water Street
New York, New York 10007

Commissioner Polly Trottenberg
New York City Department of Transportation
55 Water Street
New York, New York 10007

Commissioner Martha Stark
New York City Department of Transportation
66 John Street
New York, New York 10007

Commissioner Michael Hyman
New York City Department of Transportation
66 John Street
New York, New York  10007

Commissioner David Frankel
New York City Department of Transportation
66 John Street
New York, New York  10007

Commissioner Beth Goldman
New York City Department of Transportation
66 John Street
New York, New York  10007

Commissioner Jacques Jiha
New York City Department of Transportation
66 John Street
New York, New York  10007

Commissioner Kathryn Garcia
New York City Department of Transportation
51 Chambers Street
New York, New York  10007

John Does/Jane Does
Office of Corporation Counsel
New York City Law Department
100 Church Street
New York, New York  10007